FILED

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
FT. MYERS DIVISION

2019 JAN 23 PM 1:39

CLERK, US DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS FLORIDA

| | |
|---|---|
| DIANE ROSOLEN and DANIEL ROSOLEN, | ) ) Civil Action |
| Plaintiffs, | ) No._____ ) ) 2:19-cv-84-FtM-38CM |
| v. | ) ) |
| HOME PERFORMANCE ALLIANCE, INC., | ) ) ) |
| Defendant. | ) |

**COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiffs, Diane Rosolen and Daniel Rosolen, allege violations of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") § 501.203; the Florida Consumer Collection Practices Act § 559.55 *et seq.* ("FCCPA"), and the Truth in Lending Act 15 U.S.C. § 1601 *et seq.* ("TILA") against Defendant Home Performance Alliance, Inc.

**PARTIES**

1. Plaintiffs are natural persons and residents of Lee County, Florida.

2. Defendant is a Florida for-profit corporation with its principal place of business at 1780 102nd Avenue North, Suite 500, St. Petersburg, FL 33716.

**JURISDICTION AND VENUE**

3. Jurisdiction of this Court arises under 28 U.S.C. § 1331 because this case arises under TILA, a federal statute. The Court has supplemental jurisdiction over the Plaintiffs' state claims under 28 U.S.C. § 1367(a) because the state law claims are so related as to form the same case or controversy.

1

4.Venue is proper because the alleged acts and transactions complained of occurred here and the Defendant transacts and/or conducts business here.

## FACTUAL ALLEGATIONS

**Defendant's deceptive and misleading business practices**

5.The nature of in-home solicitation sales "often lead to abuses, over-reaching, misrepresentations and fraud." *Rossi v. 21st Century Concepts*, 162 Misc. 2d 932, 936 (N.Y. Misc. 1994). This is because "consumers are less defensive and more comfortable in their own homes and because of this are, especially, susceptible to high pressure sales tactics." *Rossi v. 21st Century Concepts*, 162 Misc. 2d 932, 935-36 (N.Y. Misc. 1994) (*citing State of New York v Stereo Importers,* 114 Misc.2d 864 (absence of opportunity for consumer to carefully consider a purchase)).

6.Defendant sells replacement windows and doors through in-home solicitation sales.

7.In its online advertisements, Defendant offers to give homeowners "free" promotional products or in-home estimates for window and door repair and replacements.

8.Defendant has designed its marketing scheme to ensure that its sales representatives get a face-to-face opportunity, in the consumers' home, to assess and target homeowners who are most vulnerable to high-pressure sales tactics. The specific representative who met with Plaintiffs did not leave until almost midnight, even though they were told the appointment would only take an hour.

9.The sales representative meets with the homeowner and spends several hours explaining why their windows need to be replaced, and then touting the supposed money

savings, energy efficacy, safety, value, and quality of the Defendant's windows.

10. Unknown to the homeowner, these representations are unsubstantiated and misleading.

11. The Plaintiffs did not file for FEMA after Hurricane Irma. When they advised the Defendant of same, their response was "Good, you can get a government loan."

12. Defendant's representatives then deceive the homeowners about the actual cost of buying the windows. The representatives tell homeowners they can finance the purchase through a federal government loan, but the Defendant's sales contract must be signed that night. The sales contract does not give the homeowner the true financing terms, but the representative requires the homeowner to sign immediately or risk losing the deal.

13. In reality, there is no federal government loan; instead, the Defendant uses a private third-party that it already has a business relationship with. The homeowner then receives the true financing agreement weeks later, containing financing terms the homeowner never knew about and never agreed to pay.

14. Further, while Defendant's sales contract purports to give the homeowner a three-day cancellation period, Defendant does not arrange the financing, and the homeowner does not learn of the actual terms of the financing agreement, until after the three days have expired.

15. The result being that if the homeowner tries to cancel after learning the actual cost of the financing, Defendant claims the original sales contract cannot be cancelled because the three days have passed.

16. Defendant then refuses to cancel the sales contract and threatens to file a lien

against the home unless the homeowner yields to the Defendant's demands.

17. Defendant's conduct is unfair and deceptive because it prevents homeowners from knowing the full repercussions of their purchase and deprives them of clear notice of their right to rescind the contract.

**Defendant's deceptive and unfair conduct with the Plaintiffs.**

18. The Plaintiffs are an elderly couple that live on a fixed income.

19. In July 2018, Mrs. Rosolen saw Defendant's advertisement online offering free in-home estimates for replacing windows and doors.

20. Mrs. Rosolen contacted Defendant about receiving a free estimate for replacing (1) window in the Plaintiffs' home.

21. Defendant scheduled an in-home appointment with Mrs. Rosolen for the evening of July 26, 2018.

22. On the evening of July 26, 2018, Defendant's representative "Ryan" arrived at the Plaintiffs' home an hour late. Because of his tardiness, he offered the Plaintiffs a $100.00 credit towards their windows.

23. During the appointment, Ryan suggested that the Plaintiffs replace all the windows in their home because it felt very hot inside. While in their master bedroom, Ryan stated "How do you sleep like this?" and advised them that it's very unhealthy.

24. The Plaintiffs were tired, and the time was getting late, but Ryan assured them that measuring the other windows would not take long, so the Plaintiffs reluctantly agreed.

25. Over the next several hours, Ryan repeatedly told the Plaintiffs they would save an incredible amount of money if they bought the Defendant's DuraSheild windows.

4

26. Ryan explained that the energy savings, construction quality, and value of Defendant's windows far exceeded any other comparable window.

27. These representations created the false expectation that Defendant's windows were superior, and therefore, worth the exorbitant price that Defendant charged. Ryan gave documents to support his representations.

28. Unknown to the Plaintiffs, and contrary to what they were told, the efficacy of Defendant's windows is comparable to windows far less expensive. But the in-home, high-pressure sales tactics used by Defendant prevented the Plaintiffs from comparison shopping.

29. As time wore on, the Plaintiffs became frustrated and uncomfortable with Ryan's presence in their home.

30. Finally, Ryan finished his sales pitch and measuring the Plaintiffs' windows around 11:00 p.m.

31. By that time, the Plaintiffs judgment was impaired because they were visibly exhausted.

32. Ryan presented the Plaintiffs with a Home Performance Alliance Contract ("Contract") for $19,988 to replace (9) windows in the Plaintiffs' home. Exhibit "A."

33. The Contract states the total sale price of $19,988 would be financed.

34. The Contract states that Defendant will charge 18% interest on the unpaid amounts due under the Contract. *Id.* at pg. 2. However, the Plaintiffs were told it would be around 5%.

35. The Contract states the transaction is a home solicitation sale and it has a three-day rescission notice, but no other rescission notice was given to the Plaintiffs.

36. The Contract has a 30% liquidated damages provision if the Plaintiffs cancel after the three-day rescission period. It also allows Defendant to file a construction lien on the Plaintiffs' home.

37. Plaintiffs could not afford $19,988, but Ryan told them that the federal government was offering affordable financing options for consumers to replace their windows.

38. Ryan told the Plaintiffs he could arrange financing for them under a special federal loan with GreenSky, a third-party that Defendant has a pre-existing relationship with, at 5.9% and their maximum monthly payment would be $98.00.

39. Ryan knew these statements were false in two ways: (1) the Plaintiffs were not approved because their credit information had yet to be submitted; and (2) the GreenSky financing wasn't a federal government loan.

40. Ryan told the Plaintiffs they had to sign the Contract that night to lock in their interest rate.

41. He then rushed the Plaintiffs through signing numerous documents, including the Contract, not explaining what they were signing.

42. Ryan did not orally tell the Plaintiffs about their three-day right to rescind the Contract.

43. The documents signed by Plaintiff, including the Contract, did not disclose the real financing terms.

44. Plaintiffs paid Defendant a $250 deposit that evening.

45. Unknown to the Plaintiffs, Defendant inflated Mrs. Rosolen's income submitted to GreenSky, and Defendant did not submit the credit information for approval until July 31, 2018, after the rescission period had passed.

46. On August 3, 2018, Defendant's representative arrived at the Plaintiffs' home to remeasure the windows.

47. The representative had Mr. Rosolen sign a "Change Order," changing the Contract.

48. Mrs. Rosolen did not sign the Change Order.

49. The Change Order included no three-day right of recession notice.

50. The Plaintiffs were shocked once they received the actual financing terms from GreenSky ("Agreement") from GreenSky. Exhibit "C."

51. On the Agreement, the total of payments is $28,451.46; the finance charge was $8,713.46; and the annual percentage rate is 6.04%.

52. The Agreement requires the Plaintiffs to pay an activation fee, which was never disclosed to them.

53. The Agreement provides that the $19,738 Amount Financed would be paid directly to Defendant.

54. Ryan disclosed none of these financing terms to the Plaintiffs on July 26, 2018, during his appointment. Nor did he disclose that the financing would not be a federal government loan.

55. The Agreement gives no three-day recession notice.

56. Plaintiffs never agreed to the financing terms provided for in the Agreement.

57. Plaintiffs would not have agreed to finance the windows or sign the Contract under the Agreement's terms.

58. On August 29, 2018, Mrs. Rosolen e-mailed Defendant and advised of all the discrepancies. She concluded the e-mail by requesting cancellation of the Contract.

59. Peter Vetere responded to Mrs. Rosolen's e-mail and advised she speak with GreenSky about the financing discrepancies.

60. Mr. Vetere then called Mrs. Rosolen so frequently, she e-mailed him on September 4, 2018, and asked that he stop calling her, and stop communicating with her daughter.

61. By this time, the Plaintiffs and their children researched the Defendant and found dozens of complaints about its deceptive business practices.

62. Mr. Vetere then called the Plaintiffs' daughter, Vanessa Rosolen, twice a day, leaving intimidating voicemails.

63. Defendant, and specifically Mr. Vetere, refused to cancel the fraudulent Contract telling the Plaintiffs that the three-day time period has passed.

64. Mr. Vetere also sent inappropriate text messages to Vanessa:



65. Defendant filed no lien the next day.

66. Mrs. Rosolen continued to receive phone calls from Defendant demanding payment for the windows.

67. On September 11, 2018, Defendant sent an employee to the Plaintiffs' home uninvited at 6:00 in the evening.

68. The employee banged on the Plaintiffs' front door and ringing the doorbell.

69. Mrs. Rosolen was terrified and demanded that he leave. The employee refused and stood in the driveway.

70. Mrs. Rosolen was terrified and hid behind a wall.

71. Two days later, on September 13, 2018, two of Defendant's employees arrived at the Plaintiffs' home, again uninvited. The time was 8:30 p.m.

72. The employees again banged on the door and rang the doorbell.

73. The employees demanded she open the door, so they could serve her with "lien" papers and demanded she pay for the windows.

74. Mrs. Rosolen was in tears, begging and pleading for them to leave, but they refused.

75. Mrs. Rosolen called the police and filed a police report against the employees. At which time, the employee advised "Fine, I'll standing the street and wait."

76. On September 21, 2018, the Plaintiffs received a letter from Cotney Construction Law sent on behalf of Defendant. Exhibit "D."

77. The letter falsely represents that the windows and door were "custom-sized, custom-colored, and otherwise specially fabricated, they cannot be returned to the manufacturer."

78. The letter then threatened to file a lien for those materials if the Plaintiffs did not pay, including "recording a construction lien and filing suit for breach of contract damages, interest, attorneys' fees and costs."

79. Defendant's employees' conduct has caused Mrs. Rosolen to have panic attacks and she is afraid to leave her home.

80. On January 9, 2019, Counsel for Defendant e-mailed Mrs. Rosolen with threats of filing a lawsuit.

81. The undersigned responded, provided a letter of representation, and asked Defendant's counsel, including Defendant, to cease all communications with the Plaintiffs.

82. Defendant's counsel confirmed receipt and advised he would direct all further communications through the undersigned.

83. Contrary to that representation, On January 18, 2019, the Plaintiffs received a "Claim of Lien" mailed directly from Defendant via Fedex, demanding the Plaintiffs pay $14,773.80.

84. The Defendant's communications made Mrs. Rosolen's heart race and she felt sick to her stomach.

## COUNT I AS TO DEFENDANT'S VIOLATION OF THE TRUTH IN LENDING ACT § 15 U.S.C. 1601 *et seq.*

85. Defendant is a "creditor" as defined under TILA because it regularly extends "consumer credit" in connection with the sale of windows and installation services for which the payment of a finance charge is or may be required. 12 U.S.C. § 1602(g) ("The term "creditor" refers only to a person who both (1) regularly extends, whether in connection with loans, sales of property or services, or otherwise, consumer credit … for which the payment of a finance charge is or may be required, and (2) is the person to whom the debt arising from the consumer credit transaction is initially payable on the face of the evidence of indebtedness or, if there is no such evidence of indebtedness, by agreement.")

86. Defendant's contract states that the total sale price of the windows would be financed. Further, the Contract states "By signing this agreement … Customer agrees to pay interest of 1 ½% per month (ANNUAL PERCENTAGE RATE OF 18%), unless otherwise required by law, on the balance of any unpaid amounts."

11

87. Defendant is also the person to whom Plaintiffs must pay the debt arising from the consumer credit transaction.

88. The transaction between Plaintiffs and Defendant was a "consumer credit transaction" because the debt was incurred for the purchase of windows and installation services for the Plaintiffs' home. 12 U.S.C. § 1602(i) ("The adjective "consumer", used with reference to a credit transaction, characterizes the transaction as one in which the party to whom credit is offered or extended is a natural person, and the money, property, or services which are the subject of the transaction are primarily for personal, family, or household purposes.")

89. TILA requires a creditor to disclose:

   a. the "finance charge", not itemized, using that term"[1];

   b. The sum of the amount financed and the finance charge, which shall be termed the "total of payments"; and

   c. The number, amount, and due dates or period of payments scheduled to repay the total of payments.

15 U.S.C. §§ 1638(a)(3)-(6).

90. Defendant violated TILA because it never disclosed: the finance charge; the amount of the total of payments; nor the due dates or payment schedule when the Contract was consummated.

---

[1] 15 U.S.C. § 1605(a) ("Except as otherwise provided in this section, the amount of the finance charge in connection with any consumer credit transaction shall be determined as the sum of all charges, payable directly or indirectly by the person to whom the credit is extended, and imposed directly or indirectly by the creditor as an incident to the extension of credit."

91. Because of Defendant's failure to disclose information required by TILA, Defendant deprived Plaintiffs from receiving information under TILA, entitling them to actual damages, statutory damages, reasonable attorney's fees and costs, and injunctive and declaratory relief. 15 U.S.C. § 1640 *et seq.*

### COUNT II AS TO DEFENDANT'S VIOLATION OF THE FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT §§ 501.203(3) AND 501.204(1)

92. Plaintiffs are "consumers" defined under Florida Statute §501.203(7).

93. Defendant engaged in "trade or commerce" as defined by Fla. Stat. Ann. § 501.203(8) when it sold windows to the Plaintiffs during a home-solicitation sale.

94. Defendant generally violated the FDUTPA under Fla. Stat. Ann. §§ 501.204 including but not limited to when it:

- misrepresented that all of the Plaintiffs' windows needed replacement or repair;
- made misleading, false, and unsubstantiated claims concerning the energy efficiency, money savings, and quality of its windows to Plaintiffs;
- when it falsely represented the financing costs of the windows sold to Plaintiffs;
- when it falsely represented to Plaintiffs about their right to cancel the Contract; and
- when it engaged in harassing and intimidating conduct while trying to force the Plaintiffs to pay the Contract.

95. But for Defendant's deceptive and unfair business practices the Plaintiffs would not have signed the Contract.

96. Defendant also committed a *per se* violation of FDUTPA when it violated the TILA, Florida's Home Solicitation Statute, and violated the FTC's Rule Concerning Cooling-

Off Period For Sales Made at Homes or At Certain Other Locations ("Cooling-Off Rule") 16 CFR 429 *et seq.*

97. The transaction between Defendant and Plaintiffs was a "door-to-door sale" as defined by the Cooling-Off Rule. 16 CFR § 429(a) ("A sale, lease, or rental of consumer goods or services in which the seller or his representative personally solicits the sale, including those in response to or following an invitation by the buyer, and the buyer's agreement or offer to purchase is made at a place other than the place of business of the seller (*e.g.,* sales at the buyer's residence or at facilities rented on a temporary or short-term basis, such as hotel or motel rooms, convention centers, fairgrounds and restaurants, or sales at the buyer's workplace or in dormitory lounges), and which has a purchase price of $25 or more if the sale is made at the buyer's residence or a purchase price of $130 or more if the sale is made at locations other than the buyer's residence, whether under single or multiple contracts.")

98. The transaction between Plaintiffs and Defendant was for the sale of consumer goods and services for the purchase and replacement of windows in their home.

99. The Defendant violated the Cooling-Off Rule because it failed to furnish (2) notice of cancellation to each Plaintiff "at the time the buyer signs the door-to-door sales contract or otherwise agrees to buy consumer goods or services from the seller, a completed form in duplicate, captioned either "NOTICE OF RIGHT TO CANCEL" or "NOTICE OF CANCELLATION," which shall (where applicable) contain in ten point bold face type the following information and statements in the same language, e.g., Spanish, as that used in the contract.

>   Notice of Cancellation
>   [enter date of transaction]

14

(Date)
You may CANCEL this transaction, without any Penalty or Obligation, within THREE BUSINESS DAYS from the above date.

If you cancel, any property traded in, any payments made by you under the contract or sale, and any negotiable instrument executed by you will be returned within TEN BUSINESS DAYS following receipt by the seller of your cancellation notice, and any security interest arising out of the transaction will be cancelled.

If you cancel, you must make available to the seller at your residence, in substantially as good condition as when received, any goods delivered to you under this contract or sale, or you may, if you wish, comply with the instructions of the seller regarding the return shipment of the goods at the seller's expense and risk.

If you do make the goods available to the seller and the seller does not pick them up within 20 days of the date of your Notice of Cancellation, you may retain or dispose of the goods without any further obligation. If you fail to make the goods available to the seller, or if you agree to return the goods to the seller and fail to do so, then you remain liable for performance of all obligations under the contract.

To cancel this transaction, mail or deliver a signed and dated copy of this Cancellation Notice or any other written notice, or send a telegram, to [Name of seller], at [address of seller's place of business] NOT LATER THAN MIDNIGHT OF [date].

I HEREBY CANCEL THIS TRANSACTION.

(Date)
(Buyer's signature)

16 CFR § 429.1(b)

    100.    Defendant also did not comply with the Cooling-Off Rule: "before furnishing copies of the "Notice of Cancellation" to the buyer, to complete both copies by entering the

name of the seller, the address of the seller's place of business, the date of the transaction, and the date, not earlier than the third business day following the date of the transaction, by which the buyer may give notice of cancellation." 16 CFR § 429.1(c).

101. Further, Defendant's representative never orally informed the Plaintiffs of their right to cancel. 16 CFR § 429.1(e) ("Fail to inform each buyer orally, at the time the buyer signs the contract or purchases the goods or services, of the buyer's right to cancel.").

102. The Defendant's lack of compliance with the Cooling-Off Rule is a *per se* FDUTPA violation. Fla. Stat. § 501.203(3) ("Violation of this part" means any violation of this act or the rules adopted under this act and may be based upon any of the following as of July 1, 2017: a) Any rules promulgated pursuant to the Federal Trade Commission Act, 15 U.S.C. ss. 41 et seq.; (b) The standards of unfairness and deception set forth and interpreted by the Federal Trade Commission or the federal courts; or (c) Any law, statute, rule, regulation, or ordinance which proscribes unfair methods of competition, or unfair, deceptive, or unconscionable acts or practices.")

103. Defendant also did not comply with Florida's Home Solicitation statute that requires "Notice of a buyer's right to cancel [to] appear on every note or other evidence of indebtedness given pursuant to any home solicitation sale." Fla. Stat. § 501.025.

104. Defendant had Mr. Rosolen sign a change form on August 3, 2018, which by Defendant's own admission evidences the "indebtedness" allegedly owed by Plaintiffs, but the Change Order did not contain any notice of a buyer's right to cancel.

105. Defendant's violation of the Home Solicitation Statute is a *per se* FDUTPA violation.

106. Plaintiffs have suffered substantial damage, including but not limited to out-of-pocket monetary loss in a $250 down payment and but for the Defendant's deceptive and unfair conduct the Plaintiffs would not have signed the Contract.

107. Because of Defendant's FDUTPA violations, Plaintiffs are entitled to actual damages, attorney's fees and costs, and declaratory and injunctive relief. Fla. Stat. § 501.211(1)-(2).

### COUNT III AS TO THE DEFENDANT'S VIOLATION OF THE FLORIDA CONSUMER COLLECTION PRACTICES ACT § 559.72(9)

108. Plaintiffs are "consumers" as defined by Florida Statute § 559.55(8) because they are natural persons allegedly obligated to pay a debt for the purchase of windows.

109. Defendant is a "person" as defined under the FCCPA because it attempted to collect a consumer debt from Plaintiffs.

110. Defendant attempted to collect a "consumer debt" from Plaintiff as defined by Florida Statute § 559.55(6) because Plaintiffs were allegedly obligated to pay a debt for personal, family, or household purposes.

111. Defendant attempted to collect, and it enforced, claimed, and asserted a known non-existent legal right to collect a debt when it demanded the Plaintiffs pay for the Contract after they exercised their right to cancel the Contract. Fla. Stat. § 559.72(9).

112. Because of the Defendant's FCCPA violation, Plaintiff suffered substantial damage, including but not limited to out-of-pocket monetary loss.

113. Plaintiffs are entitled to actual damages, statutory damages, and attorney's fees and costs because of Defendant's violation of the FCCPA. Fla. Stat. § 559.72(9).

## COUNT IV AS TO DEFENDANT'S VIOLATION OF THE FLORIDA CONSUMER COLLECTION PRACTICES ACT § 559.72(7)

114. Plaintiffs are "consumers" as defined by Florida Statute § 559.55(8) because they are natural persons allegedly obligated to pay a debt for the purchase of windows.

115. Defendant is a "person" as defined under the FCCPA because it attempted to collect a consumer debt from Plaintiffs.

116. Defendant attempted to collect a "consumer debt" from Plaintiff as defined by Florida Statute § 559.55(6) because Plaintiffs were allegedly obligated to pay a debt for personal, family, or household purposes.

117. Defendant engaged in willful conduct designed to abuse and harass the Plaintiffs when its employees arrived to the Plaintiffs home uninvited, pounded on their door, and refused to leave the Plaintiffs home until the cops were called.

118. Further, Defendant's employees engaged in willful conduct designed to abuse and harass the Plaintiffs and their family members by sending inappropriate text messages and leaving inappropriate voicemails on their phones.

119. Defendant's conduct could reasonably be expected to abuse or harass the Plaintiffs.

120. Because of the Defendant's FCCPA violation, Plaintiff suffered substantial damage, including but not limited to out-of-pocket monetary loss, fear, panic attacks, and emotional distress.

121. Plaintiffs are entitled to actual damages, statutory damages, and attorney's fees and costs because of Defendant's violation of the FCCPA. Fla. Stat. § 559.72(9).

## COUNT V AS TO DEFENDANT'S VIOLATION OF THE FLORIDA CONSUMER COLLECTION PRACTICES ACT § 559.72(18)

122. Plaintiffs are "consumers" as defined by Florida Statute § 559.55(8) because they are natural persons allegedly obligated to pay a debt for the purchase of windows.

123. Defendant is a "person" as defined under the FCCPA because it attempted to collect a consumer debt from Plaintiffs.

124. Defendant attempted to collect a "consumer debt" from Plaintiff as defined by Florida Statute § 559.55(6) because Plaintiffs were allegedly obligated to pay a debt for personal, family, or household purposes.

125. Defendant knows Plaintiffs are represented by counsel concerning any alleged debt owed to Defendant because it received a letter of representation, which included the name and address of Plaintiffs' counsel.

126. Despite receiving the notice, Defendant directly communicated with the Plaintiffs and demanded they pay the alleged debt owed to Defendant.

127. Plaintiffs' counsel has not failed to respond to Defendant's communications, and neither Plaintiff nor their counsel has consented to direct communication from Defendant.

128. Because of the Defendant's FCCPA violation, Plaintiffs have suffered substantial damage, including but not limited to fear, panic attacks, emotional distress, and invasion of the Plaintiffs' right to be free from direct contact from Defendant.

129. Plaintiffs are entitled to actual damages, statutory damages, and attorney's fees and costs because of Defendant's violation of the FCCPA. Fla. Stat. § 559.72(9).

## CONCLUSION

**WHEREFORE**, Plaintiff is entitled to actual damages, equitable relief, attorney's fees and costs, and any other such relief that the Court deems necessary.

## JURY DEMAND

Plaintiffs demand trial by jury.

>VILES & BECKMAN, LLC
>Attorneys for Plaintiff
>6350 Presidential Court, Suite A
>Fort Myers, Florida  33919
>Telephone:  239-334-3933
>Facsimile:  239-334-7105
>Email: Maria@vilesandbeckman.com
>Secondary: AOsborne@vilesandbeckman.com
>
>*/s/ Maria R. Alaimo*
>Maria R. Alaimo, Esquire
>Florida Bar Number: 103870
>
>CONSUMER LAW ORGANIZATION, P.A.
>721 US Highway 1, Suite 201
>North Palm Beach, Florida 33408
>Telephone: (561) 822-3446
>Facsimile: (305) 574-0132
>
>*/s/ Darren Newhart*
>J. DENNIS CARD, JR., ESQ.
>Fla Bar No.: 0487473
>dennis@cloorg.com
>DARREN R. NEWHART, ESQ.
>Fla. Bar No.: 0115546
>darren@cloorg.com