UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

DIANE ROSOLEN and DANIEL
ROSOLEN,

      Plaintiffs,

v.                                     Case No.: 2:19-cv-00024-JLB-NPM

HOME PERFORMANCE ALLIANCE,
INC.,

      Defendant.
_____/

# ORDER

Plaintiffs Diane and Daniel Rosolen ("the Rosolens") entered into a contract with Defendant Home Performance Alliance, Inc. ("HPA") to install nine windows and a patio door in their house. (Doc. 91-1, Ex. 2.) After talking it over with their adult children, the Rosolens soured on the contract and told HPA that they wanted to cancel the deal. (Id., 58:7–11.) The parties attempted to negotiate a compromise, but the talks turned hostile and led to several uncomfortable interactions, including one where the Rosolens called the police. (Id., Ex. 14.)

The Rosolens eventually chose to sue HPA in federal court. Their operative complaint alleges six counts—one under the federal Truth in Lending Act ("TILA"), 15 U.S.C. §§ 1601–1667f, and five more under Florida law. (Doc. 68.) HPA counterclaims for breach of contract and moves for summary judgment on all counts. (Doc. 91.) After viewing the facts in the light most favorable to the Rosolens, the Court grants summary judgment in favor of HPA on the TILA claim

because HPA is not a "creditor" as defined by TILA. The Court declines to exercise supplemental jurisdiction over the parties' remaining claims and therefore dismisses them without prejudice, including HPA's counterclaim.

## BACKGROUND

### I. The Rosolens Sign the Windows Contract and Finance Disclosure.

The Rosolens are a married couple in their mid-sixties. Mrs. Rosolen contacted HPA for a free in-home estimate after seeing an ad for the company on Facebook. (Doc. 91-1, 10:10–12.) On July 26, 2018, a sales representative from HPA came to the Rosolens' house to generate the free estimate. (Id., 11:20–23.) The Rosolens initially wanted to replace only one window in their bathroom, but the representative convinced them to replace nine windows and a patio door by claiming these renovations would lead to lower insurance premiums, lower energy costs, and better home security. (Id., 13:2–10.) That evening—after the representative had been in their house for four-and-a-half hours—the Rosolens signed a contract with HPA ("the Windows Contract"), which provided, in relevant part:

The above work will be completed in accordance with the terms, conditions and specifications herein, with payment to be made in accordance with the following payment schedule:  CASH CONTRACT ☐   FINANCE CONTRACT ☑

| 1. | PROJECT PRICE | $ 19,988 |
|---|---|---|
| 2. | INITIAL DOWN PAYMENT | $ 250 |
| 3. | BALANCE DUE | $ 19,738 |
| 4. | ADDITIONAL DOWN PAYMENT DUE UPON DELIVERY OF MATERALS | $ — |
| 5. | BALANCE DUE UPON COMPLETION | $ — |
| 6. | BALANCE TO BE FINANCED | $ 19,738 |

* BALANCE DUE UPON INSTALLATION OF WINDOWS AND DOORS **NOT AFTER THE FINAL INSPECTION**.
Customer understands and agrees there may be items to be finished after the final inspection. I.E. Plugs and trim, stress cracks, additional caulking, etc. which is covered under warranties.

PAYMENT IS TO BE MADE BY CHECK PAYABLE TO "HOME PERFORMANCE ALLIANCE, INC." ALL APPLICABLE DISCOUNTS HAVE BEEN APPLIED AT TIME OF SERVICE.

(Doc. 91-1, Ex. 2.) As the screenshot above shows, the Windows Contract contains a field with the options of "CASH CONTRACT" or "FINANCE CONTRACT." The words "FINANCE CONTRACT" are circled. The Windows Contract goes on to state a total price for the project of $19,988. That total includes a $250 down-payment, with the remaining $19,738 "TO BE FINANCED."

Crucially, the Windows Contract makes clear that payment for the project is due "UPON INSTALLATION OF [THE] WINDOWS AND DOORS." The remainder of the Windows Contract does not include the specific terms under which the Rosolens' project would be financed.

That same evening, the Rosolens also executed a separate document titled "Finance Disclosure," which states, in relevant part:

> I, <u>Daniel & Diane Rosolen</u>, understand that I am requesting that [HPA] obtain financing on my behalf from a third-party lender for my home improvement project. I realize that my financing plan is based on several factors, including but not limited to my credit score. The payment plan and terms stated below are acceptable and we agree to those terms. Should we be approved, we authorize [HPA], to proceed with our work order as per the [Windows Contract]. I also understand that this document does not represent the actual finance agreement, which will be presented before commencement of the work. The finance agreement is a separate agreement from the [Windows Contract.]

(Doc. 91-1, Ex.7.) Right below this language was a series of approximate financing terms that the Rosolens agreed to:

Total Contract Price: 19,988

Amount Financed: 19,738

Approximate Terms: 10-12   5.9 Apr

Maximum Monthly Payment: $98/212

Program Requested: GreenSky 2185

3

(Doc. 91-1, Ex. 7.) Directly below the approximate financing terms, the Finance Disclosure states, "**[HPA] is not a financial institution or lender and does not offer financing for any home improvement projects.**" (Id.) (emphasis added).

The Rosolens repeatedly assert they were very tired after the sales representative's four-and-a-half-hour pitch and did not closely read the documents they signed. Regardless, there is no dispute that they signed both the Windows Contract and the Finance Disclosure.

## II. HPA Applies for, and Receives, Third-Party Financing for the Rosolens.

At this point, it is helpful to briefly discuss how HPA does business. Many of the records pertaining to HPA's general business practices have been sealed, but the Court need not rely on those documents to outline the broad strokes of HPA's business model. Suffice it to say that HPA does not regularly (or indeed, ever) offer credit to its customers. (Doc. 91-6, ¶ 4.) As the language of the Windows Contract suggests, HPA expects full payment once their products are installed. (Id.; Doc. 91-1, Ex. 2.) If a customer chooses to finance their project, HPA works to arrange credit for the customer through third-party lenders, such that HPA can be paid upon installation. (Doc. 91-1, Ex.7.)

Here, HPA was able to obtain financing for the Rosolens' project through a financial technology company called GreenSky, Inc. ("GreenSky"), which was referenced in the handwritten portion of the Rosolens' Finance Disclosure under the "Program Requested" field. (Id.) GreenSky approved the Rosolens for a "shopping pass" account for $19,738, representing the entire balance of the Windows Contract. (Docs. 91-2, Ex. 20; 94-20.) Essentially, the "shopping pass" account was a

temporary line of credit through a bank that participated in GreenSky's loan program—in this case, SunTrust Bank ("SunTrust"). (Doc. 91-1, Ex. 8.)

To make use of their "shopping pass," the Rosolens had to sign a separate Loan Agreement with SunTrust, provide HPA with their GreenSky account number, and give HPA authorization to charge their GreenSky shopping pass account. (Doc. 91-2, Ex. 20.) If the Rosolens had gone through with this process, then their operative Loan Agreement would have been with SunTrust, not HPA (which would have been paid in full by the Rosolens' loan from SunTrust). (Doc. 91-1, Ex. 8.) But this was not to be. As explained below, the Rosolens never authorized their GreenSky account to be charged and never paid HPA any money beyond their $250 down-payment.

### III. The Rosolens have Second Thoughts About the Windows Contract.

On August 3, 2018, a different HPA employee came to the Rosolens' home to do a second measurement of the windows. (Id., 39:15–17.) That same day, Mrs. Rosolen (but not Mr. Rosolen) executed the Loan Agreement with SunTrust. (Id., Ex. 8.) The Loan Agreement included a series of loan disclosures which, in the Rosolens' view, differed materially from the approximate terms in their Finance Disclosure. For example, the Loan Agreement listed an annual percentage rate of 6.04%, whereas the Finance Disclosure seemed to provide a rate of 5.9%. (Id.)

A few weeks later, Mrs. Rosolen's adult children advised her that she and her husband were paying HPA too much for the windows, and that she could get comparable services for a better price. (Id., 63:13–25; Doc. 91-3, 10:25–11:16.) Accordingly, on August 29, 2018, Mrs. Rosolen sent an e-mail to HPA indicating

that the Windows Contract was "not valid" due to various discrepancies and instructing HPA to "please cancel this contract as of August 29th, 2018 with NO penalties." (Doc. 91-1, Ex. 12.)

After receiving this e-mail, Peter Vetere—HPA's vice president—reached out to the Rosolens by phone, text message, and e-mail to salvage the deal. (Doc. 91-8.) But these negotiations went nowhere. According to the Rosolens, HPA then began to act with increasing aggression toward them. For example, Mr. Vetere sent a text message to one of the Rosolens' daughters (who was helping her parents negotiate), calling her a "gold digging daughter mooching [off] her parents." (Doc. 91-3, Ex. 27.) There were also two instances where, according to the Rosolens, HPA employees allegedly came to the Rosolens' house in the late evening and caused Mrs. Rosolen to fear for her safety. (Doc. 91-1, 74:18–25.) In the second instance, Mrs. Rosolen called the police. (Id., Ex. 14.)

### III. The Rosolens Sue HPA Based on Its Alleged Harassment.

The Rosolens ultimately walked away from the Windows Contract without paying anything more than their $250 down-payment. There is no dispute that their GreenSky account, which they never authorized HPA to bill, expired due to inactivity. (Id., 84:7–12.) But their negative experience with HPA—particularly its alleged harassment of them and their children—inspired the Rosolens to sue. (Id., 93:10–11.) The Rosolens also contend that HPA's behavior caused them significant stress, leading to Mr. Rosolen having an accident at work because he was worried about HPA's employees harassing his wife while she was home alone. (Id., 86:3–

6

10.)  HPA counterclaims against the Rosolens for breach of contract and moves for summary judgment on all of the Rosolens' claims.  (Docs. 76, 91.)

<u>SUMMARY JUDGMENT STANDARD</u>

Summary judgment is only appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "In other words, summary judgment is warranted if a jury, viewing all facts and any reasonable inferences therefrom in the light most favorable to plaintiffs, could not reasonably return a verdict in plaintiffs' favor."  <u>Hale v. Tallapoosa Cty.</u>, 50 F.3d 1579, 1581 (11th Cir. 1995) (citing <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986)).  "The moving party bears the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial."  <u>Clark v. Coats & Clark, Inc.</u>, 929 F.2d 604, 608 (11th Cir. 1991).  "Only when that burden has been met does the burden shift to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment."  <u>Id.</u>

<u>DISCUSSION</u>

I.   **TILA Applies Only to Creditors.**

The Rosolens' sole federal claim is a TILA violation.  TILA exists "to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit."  15 U.S.C. § 1601(a).  TILA and its implementing regulation, Regulation Z (12 C.F.R. part 1026), require that: (1) "creditors 'clearly and conspicuously' disclose important terms of a consumer credit transaction"; and (2)

7

the creditor's disclosures "accurately reflect the terms of the [underlying] agreement." Stein v. TitleMax of Ga., Inc., 819 F. App'x 809, 811 (11th Cir. 2020) (quoting 15 U.S.C. § 1632(a)). "Creditors who fail to comply with these requirements are subject to civil liability." Id. (citing 15 U.S.C. § 1640(a)).

Absent some irrelevant exceptions, TILA's duty to disclose applies only to "creditors," as that term is defined by the statute. See Parker v. Potter, 232 F. App'x 861, 864 (11th Cir. 2007). TILA defines a "creditor" as:

> a person who both (1) regularly extends, whether in connection with loans, sales of property or services, or otherwise, consumer credit which is payable by agreement in more than four installments or for which the payment of a finance charge is or may be required, and (2) is the person to whom the debt arising from the consumer credit transaction is initially payable on the face of the evidence of indebtedness or, if there is no such evidence of indebtedness, by agreement.

15 U.S.C. § 1602(g). Regulation Z's definition of "creditor" parallels the one in the statute and clarifies that a down payment does not count as an installment for purposes of TILA. See § 12 C.F.R. § 1026.2(17)(i).

Moreover, TILA defines the term "credit" as "the right granted by a creditor to a debtor to defer payment of debt or to incur debt and defer its payment." 15 U.S.C. § 1602(f). TILA also makes clear that consumer credit transaction is one "one in which the party to whom credit is offered or extended is a natural person, and the money, property, or services which are the subject of the transaction are primarily for personal, family, or household purposes." 15 U.S.C. § 1602(i) (emphasis added). Finally, Regulation Z generally applies to a business that "offers or extends credit" when four conditions are met:

> (i) The credit is offered or extended to consumers;

8

    (ii) The offering or extension of credit is done regularly;

    (iii) The credit is subject to a finance charge or is payable by a written agreement in more than four installments; and

    (iv) The credit is primarily for personal, family, or household purposes.

12 C.F.R. § 1026.1(c)(1)(i)–(iv).

## II. HPA is Entitled to Summary Judgment on the Rosolens' TILA Claim Because It Is Not a Creditor.

HPA contends that it is entitled to summary judgment on the Rosolens' TILA claim because it is not a "creditor" as defined by TILA. (Doc. 91, 11–13.) Not surprisingly, the Rosolens assert that the question of whether HPA is a creditor is one for the trier of fact to resolve. (Doc. 109, 6–7.) Specifically, the Rosolens argue that the Windows Contract constitutes an extension of credit under TILA and Regulation Z, and HPA is therefore a creditor because it regularly offers its customers this type of contract. (Doc. 109, 5–10.) As will be explained, HPA is not a creditor under the applicable federal law, and the Court enters summary judgment in favor of HPA on the Rosolens' TILA claim.

To begin with, the Court rejects the Rosolens' argument that questions of fact preclude summary judgment on their TILA claim. HPA's status as a creditor turns on whether the Windows Contract is an extension of consumer credit governed by TILA and Regulation Z. And while a TILA claim is not equivalent to a contractual claim, the proper characterization of the Windows Contract depends primarily on its written terms. See Buckman v. Am. Bankers Ins. Co. of Fla., 115 F.3d 892, 893–94 (11th Cir. 1997) (holding that the terms of a contingent promissory note and mortgage executed as collateral for a bail bond did not amount to an extension of

credit under TILA); see also Feaz v. Wells Fargo Bank, N.A., 745 F.3d 1098, 1104 (11th Cir. 2014) ("Traditional contract-interpretation principles make contract interpretation a question of law, decided by reading the words of a contract in the context of the entire contract and construing the contract to effectuate the parties' intent." (citation omitted)).

After carefully reviewing the text of the Windows Contract, it clearly does not extend any credit. To reiterate, TILA defines "credit" as "the right granted by a creditor to a debtor to defer payment of debt or to incur debt and defer its payment." 15 U.S.C. § 1602(f) (emphasis added). The Windows Contract contains no deferral of payment—the entire balance, minus the down payment, is "DUE UPON INSTALLATION." (Doc. 91-1, Ex. 2); see also § 12 C.F.R. § 1026.2(17)(i) (clarifying that a down payment does not count toward the four installments in TILA's definition of "creditor"). Moreover, the Windows Contract does not direct the Rosolens to make any installment payments or impose upon them any finance charges. See 12 C.F.R. § 1026.1(c)(1)(iii). By its own text, the Windows Contract is clearly not an extension of credit governed by TILA, and HPA is therefore not a "creditor" simply because it regularly offers this type of contract.

The Rosolens nonetheless direct the Court's attention to the words "FINANCE CONTRACT" being circled after the phrase, "The above work will be completed in accordance with the terms, conditions, and specifications herein, with payment to be made in accordance with the following payment schedule." (Doc. 91-1, Ex. 2.) They also point to the fact that, besides the down payment, most of the

10

balance is 'TO BE FINANCED." (Id.) Based on this language, the Rosolens contend that HPA is a "creditor" because the Windows Contract seems to contemplate some manner of financing for most of the balance, and HPA is the only party in the agreement to whom the balance is payable. (Doc. 109 at 5–6.) Therefore, by logical extension, the Rosolens believe that the Windows Contract was an extension of consumer credit that was <u>initially payable</u> to HPA—regardless of whatever role SunTrust might have played later. As an analogy, the Rosolens compare their arrangement with HPA to an auto dealer. They quote the following official commentary by the Consumer Financial Protection Bureau ("CFPB"):

> 2. Assignees. If an obligation is initially payable to one person, that person is the creditor even if the obligation by its terms is simultaneously assigned to another person. For example:
>
> i. An auto dealer and a bank have a business relationship in which the bank supplies the dealer with credit sale contracts that are initially made payable to the dealer and provide for the immediate assignment of the obligation to the bank. The dealer and purchaser execute the contract only after the bank approves the creditworthiness of the purchaser. Because the obligation is initially payable on its face to the dealer, the dealer is the only creditor in the transaction.

12 C.F.R. Pt. 1026, Supp. I, Part 1. This analogy does not hold here. The commentary refers to situations where car buyers execute a credit agreement with a dealer, and the dealer simultaneously assigns that agreement to a bank. <u>See generally</u> <u>Ellis v. Gen. Motors Acceptance Corp.</u>, 160 F.3d 703, 705–06 (11th Cir. 1998) (discussing this type of arrangement). Unlike the commentary's example, there was never an initial extension of credit by HPA here (let alone one that was later "assigned" to SunTrust). Even more, the Rosolens fail to provide any case law extending the car dealer example to agreements like the Windows Contract.

11

The Rosolens next point to language in the Windows Contract which they characterize as a "finance charge." (Doc. 109, 7). They are referring to language on the "Terms and Conditions" page which states that the Rosolens agree to pay an annual percentage rate of 18% "on the balance <u>of any unpaid amounts</u>." (Doc. 91-1, Ex. 3) (emphasis added). The Court rejects this argument as a matter of law. A finance charge represents "the cost of consumer credit" and includes all charges imposed "as an incident to or a condition of the extension of credit." 12 C.F.R. § 1026.4(a). As set forth in Regulation Z, charges for "unanticipated late payment" or "delinquency" are not categorized as "finance charges." 12 C.F.R. § 1026.4(c)(2).

Next, the Rosolens argue that a 10.75% "dealer fee" was baked into the price of the Windows Contract, and this fee is arguably a finance charge. (Doc. 109, 7.) This fee is pulled from a commission worksheet completed by the representative who initially came to the Rosolens' home. (Doc. 110-3.) The purpose of the worksheet is to calculate the representative's commission based on the difference between: (a) the price that the Rosolens agreed to; and (b) HPA's "par price," which includes HPA's costs for using certain third-party financing services. (Doc. 110-3, 11–12). In other words, the "dealer fee" is a cost <u>that HPA bears</u>, and this fee figures into how much commission the sales representative makes based on the price he can negotiate. But there is no evidence that the dealer fee is passed down to customers who choose to finance. In fact, unrefuted testimony from HPA's executives suggests that its price list is the same regardless of whether the customer pays cash or chooses to finance. And even if the dealer fee were passed

12

down, it would not be a "finance charge" under Regulation Z. See 12 C.F.R. Pt. 1026, Supp. I, Part 1 (explaining that, subject to certain inapplicable exceptions, "[c]harges absorbed by the creditor as a cost of doing business are not finance charges, <u>even though the creditor may take such costs into consideration in determining . . . the cash price of the property or service sold</u>" (emphasis added)).[1]

In a last-ditch effort, the Rosolens point to an interrogatory where HPA admitted that it was licensed as a "Home Improvement Retail Installment Seller" under Florida law in July 2018. (Doc. 94-9, ¶12.) The Rosolens believe this licensure may imply that HPA is a "creditor" because it allows HPA to execute "home improvement" contracts payable in installments. Fla. Stat. § 520.61(13) (2018). Assuming this reading of the statute is correct, there are no record facts or evidence indicating that HPA ever used this license—much less that it "regularly extended" the type of contract contemplated by this license. See 12 C.F.R. § 1026.2(17)(i) ("A person regularly extends consumer credit only if it extended credit . . . more than 25 times (or more than 5 times for transactions secured by a dwelling) in the preceding calendar year."). And there is no record evidence that the Windows Contract in this case is the type of contract that would require this license under Florida law. See Fla. Stat. § 520.61(12) (2018). (noting that a "home

---

[1] "Although the CFPB's commentary is not binding authority, courts have found its official interpretations to be 'highly persuasive' when they fill 'a gap in the text of Section 1024.41 and squarely address[ ] the factual situation described in the Complaint.'" Nash v. PNC Bank, N.A., No. TDC-16-2910, 2017 WL 1424317, at *4 (D. Md. Apr. 20, 2017) (quoting He v. Ocwen Loan Servicing, LLC, No. 15-CV-4575 (JS)(AKT), 2016 WL 3892405, at *2 (E.D.N.Y. July 14, 2016)).

improvement" contract would necessarily require a security interest retained in the real property); see also Goldsten v. Betty Ginsburg Interior Design, Inc., 519 So. 2d 645, 647 (Fla. 4th DCA 1987) (explaining that a lien by operation of law does not create the type of security interest contemplated by the state).

Having addressed all of the Rosolens' arguments, the Court concludes with the following observations.

First, some of the Rosolens' arguments went beyond the four corners of the Windows Contract, which contains an integration clause. The law is unclear on whether the parol evidence rule always applies to TILA claims. See Anthony v. Cmty. Loan & Inv. Corp., 559 F.2d 1363, 1370 (5th Cir. 1977) ("[T]he Court can apply the [parol] evidence rule in this situation to further, not derogate, the purposes of the Act." (emphasis added)); Douglas v. Found. Funding Grp., Inc., No. 1:03-cv-2538-WSD-ECS., 2005 WL 6466539, at *4 (N.D. Ga. Feb. 24, 2005) (approving magistrate's holding that "application of the parol evidence rule in these circumstances would derogate the purposes of TILA" (emphasis added)). But see Randle v. Glendale Nissan, Inc., No. 04 C 4129, 2005 WL 281229, at *3 (N.D. Ill. Feb. 2, 2005) ("The parol evidence rule has been applied to TILA claims.").

If parol evidence may be considered, then the Rosolens must surely lose given the unambiguous language in the contemporaneously executed Finance Disclosure, which: (1) clearly authorizes HPA to seek third-party financing, (2) clarifies that the actual financing agreement is different from the Windows Contract, and (3) states that "[HPA] is not a financial institution or lender and does not offer financing for

14

any home improvement projects." (Doc. 91-1, Ex. 7.) The Finance Disclosure soundly dispels any notion that the Windows Contract was ever intended to be an extension of credit under TILA. Regardless, the plain language of the Windows Contract is enough to defeat the Rosolens' claim.

Second, prior to 1982, TILA's definition of "creditor" included people who "arranged for the extension of credit"—which is precisely the role that HPA seems to have played. But TILA was amended to eliminate that part of the definition. See generally Robey-Harcourt v. Bencorp Fin. Co., 212 F. Supp. 2d 1332, 1334 (W.D. Okla. 2002), aff'd, 326 F.3d 1140 (10th Cir. 2003). Indeed, the Northern District of Illinois took note of this amendment when it dismissed a TILA claim with prejudice based on a home improvement financing arrangement very similar to the one in this case. See DeLeon v. Beneficial Const. Co., 55 F. Supp. 2d 819, 822, 829 (N.D. Ill. 1999) (noting that arrangers of credit were no longer subject to TILA and dismissing claim against construction company that arranged financing of owners' home improvements by referring them to a mortgage broker, who then located a lender). The Court declines to rewrite federal law to include a long-defunct cause of action against arrangers of credit under TILA.

### III. The Court Declines Supplemental Jurisdiction Over All Remaining Claims.

Without the TILA claim, there is no basis for original federal jurisdiction, and HPA invites the Court to dismiss the Rosolens' remaining state law claims under 28 U.S.C. § 1367(c)(3). (Doc. 91, 8.) "[C]onsiderations of judicial economy, convenience, fairness, and comity may influence the court's discretion to exercise supplemental jurisdiction." Baggett v. First Nat'l Bank of Gainesville, 117 F.3d 1342, 1353 (11th

Cir. 1997). But "in the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered . . . will point toward declining to exercise jurisdiction over the remaining state-law claims." <u>Carnegie-Mellon Univ. v. Cohill</u>, 484 U.S. 343, 350 n.7 (1988). While the Court appreciates that the parties have expended a substantial amount of time litigating this case in a federal forum, and that dismissal of the state-law claims would require them to begin anew in state court, it nevertheless concludes that dismissal of the Rosolens' remaining claims is appropriate. See <u>Murphy v. City of Aventura</u>, 383 F. App'x 915, 918–19 (11th Cir. 2010). Accordingly, the Rosolens' remaining claims and HPA's counterclaim for breach of contract are dismissed without prejudice to be filed in a Florida state court (if the parties so desire).

## CONCLUSION

For the reasons above, it is **ORDERED** that HPA's motion for summary judgment (Doc. 91) is **GRANTED as to Count I** of the second amended complaint (Doc. 68). The Court **DISMISSES Counts II–IV of the second amended complaint and Counterclaim I of the answer WITHOUT PREJUDICE** to refile in the state court. 28 U.S.C. § 1367(c)(3). (Docs. 68, 76.) The Clerk is **DIRECTED** to terminate all pending deadlines and close this case.

**ORDERED** in Fort Myers, Florida, on October 28, 2020.

*[signature: John L. Badalamenti]*

JOHN L. BADALAMENTI
UNITED STATES DISTRICT JUDGE